KEKER, VAN NEST & PETERS LLP
ERIC H. MACMICHAEL - # 231697
emacmichael@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:     415 397 7188

Attorneys for Defendant Jake Soberal

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| United States of America, | Case No. 24-CR-000159-2 |
| Plaintiff, | **DEFENDANT JAKE SOBERAL'S SENTENCING MEMORANDUM** |
| v. | Date:      December 17, 2024 |
| Jake Soberal, | Time:      9:00 a.m. |
| Defendant. | Ctrm:      5 |
| | Judge:     Hon. John C. Coughenour |

2839819

### TABLE OF CONTENTS

I.      INTRODUCTION ...............................................................................................1

II.     BACKGROUND FACTS ....................................................................................2

        A.      Mr. Soberal's Personal History...............................................................2

                1.      Early Life .....................................................................................2

                2.      Foundation in Fresno ..................................................................4

                3.      College ........................................................................................5

                4.      Return to Fresno ........................................................................6

                5.      Bitwise ........................................................................................9

                6.      Accepting Responsibility ..........................................................15

III.    THE FACTORS IN 18 U.S.C. § 3553(A) MERIT A BELOW-GUIDELINES
        SENTENCE .....................................................................................................16

        A.      Applicable Legal Standard Under 18 U.S.C. § 3553 ............................16

        B.      The § 3553(a) Factors Warrant a Sentence Below the Advisory Guidelines ........18

                1.      The Nature and Circumstances of the Offense .........................18

                2.      Mr. Soberal's History and Characteristics .................................22

                3.      The Purposes of Sentencing.......................................................29

                4.      A Need to Avoid Unwarranted Sentencing Disparities ............31

                5.      Restitution .................................................................................35

        C.      RDAP and Self-Surrender......................................................................35

IV.     CONCLUSION.................................................................................................35

DEFENDANT JAKE SOBERAL'S SENTENCING MEMORANDUM
CASE NO. 24-CR-000159-2

2839819

1

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                          **Page(s)**

*Koon v. United States*,
    518 U.S. 81 (1996)...................................................................................................21

*United States v. Adelson*,
    441 F. Supp. 2d 506-515 (S.D.N.Y. 2006) .......................................18, 21, 28, 2 9, 30, 32, 34

*United States v. Autery*,
    555 F.3d 864 (9th Cir. 2009) .................................................................................16

*United States v. Booker*,
    543 U.S. 220 (2005)................................................................................................16

*United States v. Carty*,
    520 F.3d 984 (9th Cir. 2008) ........................................................................16, 17, 21

*United States v. Corsey*,
    723 F.3d 366 (2d Cir. 2013)...................................................................................19

*United States v. Ferguson*,
    No. 3:06-cr-00137 (D. Conn. 2008).........................................................................33

*United States v. Gupta*,
    904 F. Supp. 2d 349 (S.D.N.Y. 2012)...............................................................2, 19, 29, 30

*United States v. Johnson*,
    No. 16-CR- 457-NGG, 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018) .................................28

*United States v. Lay*,
    568 F. Supp. 2d 791 (N.D. Ohio 2008).....................................................................20

*United States v. McClellan*,
    1:16-cr-10094 (D. Mass.)......................................................................................32

*United States v. Milne*,
    384 F. Supp. 2d 1309 (E.D. Wis. 2005)....................................................................21

*United States v. Parris*,
    573 F. Supp. 2d 744 (E.D.N.Y. 2008) ..................................................................20, 34

*United States v. Paul*,
    561 F.3d 970 (9th Cir. 2009) ................................................................................16

*United States v. Prosperi*,
    686 F.3d 32 (1st Cir. 2012)..................................................................................20

*United States v. Shor*,
    1:18-cr-00328 (S.D.N.Y.) ...................................................................................32

*United States v. Taylor*,
    1:19-cr-00850-JSR (S.D.N.Y.) ..........................................................................32

*United States v. Thurston*,
    544 F.3d 22 (1st Cir. 2008) ................................................................................23

*United States v. Tomko*,
    562 F.3d 558,572 (3d Cir. 2009) .......................................................................23

*United States v. Wang*,
    1:16- cr-10268 (D. Mass.) .................................................................................32

**Statutes**

18 U.S.C. § 3553 ......................................................................................................16, 17

**Secondary Authorities**

JSIN, Sentences Under the Guidelines Manual and Variances Over Time,
    https://ida.ussc.gov/analytics/saw.dll?Dashboard (last visited December 2,
    2024) ...................................................................................................................31

*Stephanos Bibas, White–Collar Plea Bargaining and Sentencing After Booker*, 47
    Wm. & Mary L.Rev. 721, 724 (2005) ...............................................................30

U.S. Sentencing Commission, Interactive Data Analyzer,
    https://ida.ussc.gov/analytics/saw.dll?Dashboard (last visited December 2,
    2024) .............................................................................................................31, 32

DEFENDANT JAKE SOBERAL'S SENTENCING MEMORANDUM
CASE NO. 24-CR-000159-2

2839819

1    **I.     INTRODUCTION**

2          Jake Soberal stands before the Court for sentencing after pleading guilty to the serious

3    crime of defrauding lenders and investors in Bitwise Industries, the company Mr. Soberal co-

4    founded and co-led along with Irma Olguin.  While there are many details, documents and

5    victims associated with this tragic story, the simple version is this: As Bitwise began to fail in

6    mid-2022, Mr. Soberal embarked on a desperate campaign to raise money for the singular goal of

7    keeping the company afloat and its hundreds of employees employed. In his misguided effort to

8    save Bitwise, Mr. Soberal resorted to lies that became more and more egregious as the situation

9    became more and more desperate.  When his efforts to save Bitwise failed, Mr. Soberal took

10   complete responsibility for his actions, volunteering to cooperate with the government and

11   immediately confessing to all of his mistakes, with no promises of leniency.

12         In finding a just punishment for Mr. Soberal, the Court's task is a difficult one.  On the

13   one hand, Mr. Soberal's misconduct is undeniably serious and affected many people.  Mr. Soberal

14   has been—and will continue to be—the *first* person to explain how wrong his actions were, and

15   how far he deviated from his values in his frantic attempt to save Bitwise.  But on the other hand,

16   all parties agree that Mr. Soberal's motives stand in stark contrast to his actions.  The government

17   agrees that Mr. Soberal did not act out of greed or a desire to profit, and that every penny he

18   obtained went towards paying Bitwise's employees and other expenses.  Indeed, Mr. Soberal lent

19   Bitwise virtually all of *his* family's personal savings at the time Bitwise was failing, which was

20   lost along with other money.  Mr. Soberal is thus the extremely rare fraud defendant who did not

21   seek to gain financially from his misconduct, which renders his guidelines calculation—driven

22   almost entirely by the loss amount—an unhelpful benchmark.

23         There can also be no dispute that Jake Soberal is a fundamentally good person who, up

24   until these events, had led an exemplary life defined by devotion to his family, church, friends,

25   and community.  As detailed in the 70+ plus letters submitted to the Court, Mr. Soberal is a

26   devoted husband and father to three young children.  He is a devout Christian who has given his

27   time and his resources to his church.  He has devoted thousands of hours to charitable and civic

28

DEFENDANT JAKE SOBERAL'S SENTENCING MEMORANDUM
CASE NO. 24-CR-000159-2

2839819

organizations designed to improve the Fresno community, and he did all of it with kindness and humility.  He is a hard worker who spent a decade building a company whose mission was to provide opportunities to underrepresented and underestimated people in his hometown of Fresno, California.  And for many years, this company succeeded by helping thousands of people find a better life through opportunities that were not previously available to them.  We urge the Court to review the letters submitted by the dozens of people who know Mr. Soberal best so that the Court is able to "judge the man as a whole[.]" *United States v. Gupta*, 904 F. Supp. 2d 349, 354 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014).  We respectfully submit that the "whole" of Jake Soberal is clearly not someone who deserves to be sent to prison for more than 12 years as recommended by the sentencing guidelines.

*****

Section 3553(a) requires the Court to fashion a sentence "sufficient, but not greater than necessary," to serve the purposes of sentencing. The defense respectfully requests that the Court impose a sentence of 60 months, which is a significant sentence that will take Mr. Soberal away from his young children during a critical time in their lives. We acknowledge that this is below the guidelines range and that it does not comport with the media's portrayal of this case or the views expressed by a handful of victims. But the Court's difficult task is to look beyond those surface-level views when it fashions its sentence. In doing so, we ask that the Court consider, as it must, the real person, his real motives, the circumstances surrounding the offense conduct, and the degree to which Mr. Soberal has already suffered as a result of his mistakes.  We urge the Court to conclude that this is a case where the mechanical application of the guidelines produces an unjust result.

## II.    BACKGROUND FACTS

### A.    Mr. Soberal's Personal History

#### 1.    Early Life

Jake Alexander Soberal is a California native, born in Los Angeles in 1985 to young

DEFENDANT JAKE SOBERAL'S SENTENCING MEMORANDUM
CASE NO. 24-CR-000159-2

2839819

parents who had children before they knew how to process their own trauma. Soberal's paternal grandmother waited until she felt the pang of contractions while pregnant with Mr. Soberal's father, Mario Soberal, before she swam across the Rio Grande River in active labor. Despite fleeing to the United States for a better life, Mr. Soberal's grandparents faced brutal poverty and language barriers in 1950-1960s East Los Angeles. The unyielding shame of failing to provide their children with bare necessities created an abusive and volatile home. Mario Soberal enlisted in the Marine Corps immediately upon graduating high school. Following a parachuting accident, he was medically discharged from the military and used his G.I. bill to attend college.

Mr. Soberal's mother, Marlee, is the only daughter of "Dust Bowl" era "Okies." Mr. Soberal's maternal grandparents survived the Great Depression but not without the badges of constantly fearing the financial ruin that marked much of their early lives. While their life seemed idyllic, Mr. Soberal's mother suffered from prolonged sexual and physical abuse. Mr. Soberal's mother eventually earned an associate's degree, which allowed her to gain administrative work to support herself before the arrival of her first child, Jake. Mr. Soberal's parents went on to have Morgan, a daughter, followed by a third child, Jed, a son.

Mr. Soberal had the foundation of two loving parents, food on the table, and a roof over his head. However, his parents carried with them the pain of childhood physical, sexual, and emotional abuse. These "repercussions spilled over" onto the Soberal children as their parents were "deeply broken people trying to recover from complex childhoods of their own."[1] Mr. Soberal's mother suffered from untreated bi-polar disorder. This led to frequent and outrageous fits of anger, breaking household objects, profane and "belittling language," and hours of screaming, mostly directed at Mr. Soberal's father. Mario Soberal fought post-traumatic stress disorder (PTSD) and chronic anxiety, created by his military service and his own childhood abuse. When Mario Soberal was absent, Marlee Soberal turned her ire to her eldest son, Jake. Mr. Soberal "carried the brunt of the abuses we experienced as the stronger older brother."[2]

---

[1] Appendix at Tab 61, Letter from Morgan Soberal-Terry.
[2] Appendix at Tab 61, Letter from Morgan Soberal-Terry.

DEFENDANT JAKE SOBERAL'S SENTENCING MEMORANDUM
CASE NO. 24-CR-000159-2

2839819

Mr. Soberal learned early what it took to broker peace between his parents in his home while prioritizing shielding his young siblings from the turbulent fighting. Mr. Soberal assumed the role thrust onto him as peacemaker, problem-solver, and above all else, someone who must become successful. He "internalized the expectations so much" that he believed it was his duty to "perpetually be trying to save others and to absolutely never risk failure."[3] This impossibly high expectation sat on Mr. Soberal's shoulders starting at eight years old. Mr. Soberal also observed his father working fourteen-hour days to keep the family housed and fed. His father impressed on him that if he failed to be anything short of an excellent student and son, then the sacrifices of his parents and grandparents were meaningless. Mr. Soberal understood that it was his duty to grow into a successful man who could provide for his family and community. Mr. Soberal felt that he was independently responsible for his family's future successes, and that if he could not reach this success, he was a failure.

### 2. Foundation in Fresno

In 1999, Mr. Soberal's father was offered a job with higher pay at an early tech start up in Fresno. Fresno offered an opportunity for the family to afford home that could fit their growing family. A young Mr. Soberal hoped the move would ease the stressors that fueled the fighting and chaos both in and out of his home. But Mr. Soberal's transition to Fresno was complicated by the fact he had become severely obese due to poor eating and exercise habits as a child.[4] Classmates chased Mr. Soberal, and jeered at him, saying that he was "fat" and needed to run. In seventh grade, a classmate attacked Mr. Soberal, and severely injured both of his hips. The resulting injury required emergency surgery and bound Mr. Soberal to the use of a wheelchair and crutches for a year.  leaving him with a severely injured hip and forced to use a wheelchair and crutches for a year.[5] Mr. Soberal internalized the ridiculing of his peers and his physical inability to walk as his personal failure. While others may have been angry or lashed out, Mr. Soberal treated his

---

[3] Appendix at Tab 61, Letter from Morgan Soberal Terry.

[4] Appendix at Tab 5, Letter from Vincent Banuelos.

[5] Appendix at Tab 61, Letter from Morgan Soberal-Terry.

DEFENDANT JAKE SOBERAL'S SENTENCING MEMORANDUM
CASE NO. 24-CR-000159-2

2839819

bullies with kindness despite not gaining the acceptance of his peers. [6] Desperate to not be seen as a "failure," Mr. Soberal started running, lifting weights, and hit a growth spurt. He lost more than 100 pounds by the time he started his freshman year at Clovis High School.

Fresno delivered on giving Mr. Soberal a better life. Mr. Soberal excelled in school and played baseball. At age 13, he met Sarah Stacier, who quickly became his best friend, and who would later become his wife and the mother of his three children. During his senior year, Mr. Soberal ambitiously applied to be Editor-in Chief of the school's newspaper. He had raw talent but no prior experience. The newspaper invited him on as a staff writer. Even though Mr. Soberal had no experience, his unreasonably high expectations left him feeling like a failure, for having been passed-over as Editor. He accepted the lower position and "never once exhibited any kind of disappointment."[7] Mr. Soberal was assigned to write a report on the City of Clovis. He learned every fact he could about the city. He interviewed then Mayor of Clovis, Lynn Ashbeck. With that success, he contacted editors at Time Magazine and USA Today to cover national events. Mr. Soberal was selected as the top male student journalist in California by USA Today. The publication flew Mr. Soberal to Washington D.C. for a three-day gathering where he saw the pace of the Washington Post Newsroom. When he received praise for seeking out news sources, or earned recognition for his pieces in the community, he experienced the external validation that he did not receive at home.

### 3.    College

Following high school, Mr. Soberal spent a year at Hofstra University, before transferring to the University of North Carolina at Chapel Hill ("UNC"). At UNC, Mr. Soberal confronted an ugly reality that he had never experienced before. Growing up in California, Mr. Soberal understood that racism existed in his history books and in isolated anecdotes like when his father was refused a promotion because a "Mexican" could not have the role. However, at UNC, Mr. Soberal saw the segregation between black and white people for the first time. Mr. Soberal,

---

[6] Appendix at Tab 5, Letter from Vincent Banuelos.
[7] Appendix at Tab 45, Letter from David Menedian

DEFENDANT JAKE SOBERAL'S SENTENCING MEMORANDUM
CASE NO. 24-CR-000159-2

2839819

whose lineage was half-Mexican, was deeply bothered by the bias he saw amongst his peers. Mr. Soberal befriended many black students through an early minority student orientation offered to transfer students. He and his friends founded a student club, O.T.H.E.R. (Outlaw the Hate and Encourage Responsibility) to combat the bias and segregation that was inherent in student life at UNC. He hosted social events, debates, and speakers to bridge the cultural and racial gap amongst UNC's students.

Mr. Soberal also developed his passion for rowing. Mr. Soberal loved the feeling of waking early at 5:00am for crew practice and knowing that he physically and emotionally challenged himself before most of his peers woke for the day. However, UNC's club rowing program only had three other student-athletes and no coach when Mr. Soberal arrived to campus his first year at UNC. Mr. Soberal worked with teammates to recruit new rowers across the university community. The total number of rowers grew to over forty student-athletes upon his graduation. Mr. Soberal and his teammates also petitioned the school to collect alumni contact information and planned an "All Class Reunion Benefit" to fundraise for expansion of the rowing club program. The students did yard work for neighbors, phone banked and collected dues to raise money to compete. In three years, under Mr. Soberal's leadership, the alumni fundraiser became an annual event, which funded an endowment for a salaried full-time coach to lead the crew team.[8] The annual event that grew to become the largest affinity group gathering at UNC during Mr. Soberal's tenure.

### 4.    Return to Fresno

Following college Mr. Soberal attended Western State College of Law in Orange County, California, where he excelled academically and as a member of the school's moot court team. While law school can bring out a student's competitive nature, Mr. Soberal still worked "collaboratively" with his classmates and went out of his way to encourage his peers.[9]

Serving at the Los Angeles County Public Defender's Office during law school was a

---

[8] Appendix at Tab 49, Letter from Michael Nichols.

[9]  Appendix at Tab 1, Letter from Kevin Allen.

DEFENDANT JAKE SOBERAL'S SENTENCING MEMORANDUM
CASE NO. 24-CR-000159-2

2839819

1  formative experience for Mr. Soberal. He was assigned to juvenile court where he could appear

2  on behalf of defendants as a law student with supervision. The public defenders were often so

3  busy that Mr. Soberal was the only person available to meet with the defendants before their

4  initial hearings. While Mr. Soberal used his limited legal knowledge to advise these defendants

5  about their cases, he more often found himself comforting young black and brown clients who

6  were scared, hurt, and angry. Mr. Soberal saw disenfranchised people as not unlike himself. He

7  realized that these individuals not only needed legal services, but systemic assistance that could

8  reveal their true potential for good.  As a Christian, he valued service and generosity above all

9  else. Serving others energized Mr. Soberal. He was determined to find a way to serve others in his

10 community at a larger scale. His greatest gift was and his "to help others see" their best self, and

11 to "help them take the first steps" towards being that self.

12      During his second year of law school Mr. Soberal became restless in his desire to return

13 home to Fresno. He convinced his then fiancé, Sarah, that he could commute to Southern

14 California for the last eighteen months before graduation. Returning to Fresno allowed Mr.

15 Soberal to earn law clerk role at a local law firm and serve at several local non-profit

16 organizations.

17      Mr. Soberal prioritized investing his time and energy in his family, community, and his

18 church. He married Sarah Soberal in 2009. In their marriage, Mr. Soberal "wears his heart on his

19 sleeve."[10] He shows up as a husband with "honor, loyalty, patience, and love."[11] In 2013, the

20 Soberals welcomed their first child, █████ then in 2014, █████ and in 2017 their last child,

21 █████ Daily, Mr. Soberal tells his children, "What are the two most important things?" to which

22 they excitedly respond, "Love God, and Love Others."[12] When his children were young, Mrs.

23 Soberal stayed home juggling the task of raising three small children. Mr. Soberal was ever

24 present. There were many days that he came home to an "exhausted wife."[13] Instead of

25 [10] Appendix at Tab 56, Letter from Sarah Soberal.

26 [11] Appendix at Tab 56, Letter from Sarah Soberal.

27 [12] Appendix at Tab 56, Letter from Sarah Soberal.

   [13] Appendix at Tab 56, Letter from Sarah Soberal.

28

DEFENDANT JAKE SOBERAL'S SENTENCING MEMORANDUM
CASE NO. 24-CR-000159-2

2839819

prioritizing himself, he "jumped in and cooked dinner, played with their toddler, or started in on dishes" leftover from the morning" Mr. Soberal was there "coaching their U6 soccer teams" and "saying prayers with them at bedtime."[14] Mr. Soberal's care for his family is a reflection for his love of God and the community. He envisioned building a family that would also contribute to the community, and he succeeded – his family became one of the "wonderful young families" dedicated to the future of Fresno that "contribute to their community."[15]

Even before Bitwise, Mr. Soberal "loved to serve others" and his "city" in his "day to day interactions[.]"[16] At church, Mr. Soberal led a bible study that he opened to the community. Mr. Soberal "did not think twice about welcoming others in[,]" regardless of their background or circumstances.[17] Those who had a "broken past, who once called literally the street home[,]" felt that he "welcomed" them with "pure and unrivaled acceptance" into a group of "business owners, teachers, and pastors," who treated them "like family with a complete lack of judgment."[18] People who came to know Mr. Soberal, understood that there were "no expectations" in return for them being there. Mr. Soberal was "simply glad" to be present in his community, giving back to others.[19]

Mr. Soberal went the "extra mile."[20]  He leads an annual camping trip for local fathers. The goal of the trip is to give children positive male role models. The group has grown into a "supportive and sensitive group of adult men who are genuinely interested in how to be better men" for their children, partners, and selves.[21]  He served on the Hamilton School Site Council so that he could "work alongside" other families because he was "dedicated to the school

---

[14] Appendix at Tab 56, Letter from Sarah Soberal.

[15] Appendix at Tab 13, Letter from Steve and Rocky Cleary.

[16] Appendix at Tabs 28, Letter from Josh Hawley; and 36, Letter from Aaron Kelly.

[17] Appendix at Tab 32, Letter from Bryanna Hornor.

[18] Appendix at Tab 33, Letter from Shawn Horner.

[19] Appendix at Tab 24, Letter from Kyle Guess.

[20] Appendix at Tab 26, Letter from Andy Hansey-Smith.

[21] Appendix at Tab 68, Letter from Steve Wilburn.

DEFENDANT JAKE SOBERAL'S SENTENCING MEMORANDUM
CASE NO. 24-CR-000159-2

2839819

community[.]"[22]Mr. Soberal re-initiated a program for "boomerangs" – those who moved away for college and careers – to return to the Central Valley so that the community was enriched by "much needed" talent.[23]

Mr. Soberal felt a "responsibility" to those "on the margins[.]"[24] When friends or neighbors struggled with their health, Mr. Soberal "organized a day to care for their yard" because they were "unable." Mr. Soberal approached his community like his family, with "generosity and openness[,]" always willing to "lend a hand."[25]At his core, Mr. Soberal is a "helper, someone who desires to lift up and encourage everyone around him."[26] His community felt this impact.

### 5.    Bitwise

Mr. Soberal's trajectory as a practicing attorney changed in 2011 when he met then Mayor Ashley Swearengin, who shared Mr. Soberal's passion for revitalizing Downtown Fresno. Fresno was awarded $70 million in federal funds for this project, however, the City Council considered turning down the funds believing that it would be wasted in Downtown Fresno. Together, Mr. Soberal and Mayor Swearengin created the "I Believe in Downtown Fresno" Project ("I Believe Project"). Mr. Soberal pitched the revitalization of Fresno's downtown area to friends and family in their living rooms, at church meetings, and in community centers to build public support for the project. He spent hours posting signs pledging his belief in bringing a vibrant town center to the community. With backing from the community – aided substantially by Mr. Soberal's effort – the city council approved funding for the project.

One of the project's supporters was Irma Olguin, Jr, who had quickly become Mr. Soberal's close friend and trusted advisor. Ms. Olguin's support followed Mr. Soberal's support of an event that Ms. Olguin founded, "59DaysOfCode," a competition that challenged local

---

[22] Appendix at Tab 71, Letter from Steven Zook.
[23] Appendix at Tab 26, Letter Andy Hansen-Smith.
[24] Appendix at Tab 71, Letter from Steven Zook.
[25] Appendix at Tab 67, Letter from Robert Wiens.
[26] Appendix at Tab 67, Letter from Robert Wiens.

DEFENDANT JAKE SOBERAL'S SENTENCING MEMORANDUM
CASE NO. 24-CR-000159-2

2839819

technologists to develop a market-ready web application in 59 days, with startup capital and other resources provided to the winners. The competition endeavored to prove that people in the Central Valley could contribute to the technology economy alongside their better-known Bay Area neighbors. Mr. Soberal was impressed by Ms. Olguin's commitment to providing these exciting resources to the community and came to believe that she was behind all of the most exciting tech developments in Fresno. Mr. Soberal donated his time to support Ms. Olguin's efforts, and formed a non-profit organization to support 59DaysOfCode.

Mr. Soberal, longing to see his hopes for Downtown Fresno become a reality, had an idea to connect with a building owner in Downtown Fresno to oversee improvements to the building and fill it with small business tenants who were complimentary to one another. Ms. Olguin previously started a coworking space and felt that many of the members needed a larger, private, office space. These combined ideas were the genesis of Bitwise Industries.

In 2013, when Mr. Soberal and Ms. Olguin founded Bitwise, neither of them had any business management or financial expertise, and Bitwise's business plan reflected that lack of experience. Mr. Soberal relied on his past community engagement work and his deep desire to serve others to drive Bitwise forward. Mr. Soberal envisioned that Bitwise could grow the local economy by providing training to underrepresented people, hire those same people into tech roles building software for clients, and house the operation in a "tech hub" owned by Bitwise and leased to other emerging tech companies. The co-founders were deliberate in recruiting from the most underestimated groups: recent immigrants, formerly incarcerated people, and non-English speakers.

To fulfill its mission, Bitwise would have to serve multiple related functions. First, these underrepresented workers needed training. Bitwise offered a training program to teach in-demand skills tailored to entry-level tech jobs. Second, the founders anticipated that the trainees from underprivileged backgrounds would encounter barriers to employment, so Bitwise would hire them into its software consulting firm where they could further develop their skills, expand their resume, and improve their employability. Third, Bitwise would purchase and improve blighted

DEFENDANT JAKE SOBERAL'S SENTENCING MEMORANDUM
CASE NO. 24-CR-000159-2

2839819

properties in Downtown Fresno to operate its business alongside third-party technology company tenants. All of this being intentionally created in Downtown Fresno was emblematic of Mr. Soberal's vision for the company; to help the "underdogs" by bringing resources to people and places that were overlooked by society, beginning in his hometown.

For several years, Bitwise brought "hope to [their] city and jobs to the overlooked."[27] Bitwise carried out its mission of giving Fresno's most underestimated workers the skills and wages that could foundationally change their lives. Bitwise did more than just teach technology skills, it provided services to address the comprehensive needs of the people it served. The skills Bitwise aimed to teach were not just limited to tech training. Bitwise purchased large passenger vans to provide trainees trapped in systemic poverty a means to get to and from training and work. Presentence Investigation Report ("PSR") at ¶43. Bitwise hired a Licensed Marriage and Family Therapist to counsel Bitwise's trainees through mental and emotional health issues that are common for individuals who have experienced the trauma of chronic financial stress. *Id.* Bitwise provided access to free and reduced-cost food to its employees with food insecurity. *Id.* It paid every employee over $70,000—far more than market rates in Fresno—and provided a 401k with a maximum allowed match. *Id.* Prior to its collapse, Bitwise was in the final steps of establishing a free childcare program that would provide safe and reliable childcare that is often a barrier for women and minorities entering the work force. *Id.* Bitwise aimed to give its employees financial and emotional stability that most had never experienced before.

Bitwise put its support behind "broader social causes" impacting the community.[28] During the COVID-19 pandemic, Bitwise launched a grocery-delivery program that delivered more than 2 million meals to Fresno-area residents who were elderly, immunocompromised, or sick. Also during the pandemic, Bitwise built a free web application called OnwardCA, which coordinated displaced workers with essential services (i.e., food, shelter, etc.), job training opportunities, and available jobs tailored to the needs of the worker's user profile. The web application, which was

---

[27] Appendix at Tab 56, Letter from Sarah Soberal.
[28] Appendix at Tab 44, Letter from Miguel Macias

DEFENDANT JAKE SOBERAL'S SENTENCING MEMORANDUM
CASE NO. 24-CR-000159-2

2839819

1    announced by Governor Gavin Newsom during a live press conference, was adopted by the State

2    of California and 14 other states around the country. OnwardCA would go on to serve hundreds

3    of thousands of people during the pandemic. Further, in response to the death of George Floyd,

4    Bitwise pledged to give $100,000 to nonprofits serving the black community organizations. Mr.

5    Soberal directly donated thousands from his personal bank account towards this cause.  Later,

6    Bitwise provided "water" and "food" to farm worker who marched a "335-mile pilgrimage"

7    through California for the right to vote by mail.[29] At its core, Bitwise valued uplifting

8    marginalized communities. For many, Bitwise provided an "incredible opportunity" for those

9    often overlooked and undervalued.[30]

10         By 2017, Bitwise had approximately 50 employees but was low on cash. Mr. Soberal and

11   Ms. Olguin talked about slowing the growth of the company in order to reduce expenses and

12   preserve cash.  Having grown their careers and Bitwise in Fresno, Mr. Soberal and Ms. Olguin

13   were totally ignorant about available venture capital investments. But after speaking with several

14   potential investors in the Bay Area who focused on venture capital for technology startups, Mr.

15   Soberal became convinced that Bitwise was not raising enough, spending enough, or growing

16   quickly enough.  These investors explained that Bitwise was too young to consider profitability,

17   that all startups lose money, and that living hand-to-mouth is a normal existence for startup

18   technology companies. These discussions cemented the belief for Mr. Soberal that growth was the

19   key to a successful business, and that spending more money than you generated was not

20   uncommon. This was the first of many mistakes underlying the offense conduct that Mr. Soberal

21   deeply regrets.

22         Bitwise set out to raise the money needed to grow quickly and have a large impact. Mr.

23   Soberal and Ms. Olguin, who had no experience raising institutional capital, set out to raise a

24   round of financing in 2017. After two years of protracted fundraising efforts, Bitwise successfully

25   raised a Series A financing of approximately $22 million in May of 2019. Despite public

26   _____

27   [29] Appendix at Tab 44, Letter from Miguel Macias.
     [30] Appendix at Tab 44, Letter from Miguel Macias.

28

DEFENDANT JAKE SOBERAL'S SENTENCING MEMORANDUM
CASE NO. 24-CR-000159-2

2839819

excitement, the length of time it took Bitwise to raise this capital came at a steep cost. Mr. Soberal and Ms. Olguin had to raise approximately $14 million in private loans and convertible notes (money that came into the company prior to the close of the financing, but converted into equity with the close of the financing) to fund the company's operations on its way to the close of the Series A financing. After buying-out early investors, repaying debts, and accounting for the convertible notes that became Series A preferred equity, Bitwise had only a few million dollars leftover for its operations and growth. PSR ¶9. This round of Series A funding allowed Bitwise to expand from Fresno to Bakersfield, Merced, and Oakland. *Id.*

   In December of 2020, Bitwise had grown to several hundred employees and set out to raise a Series B round of investments.  Over the course of more than a year, Bitwise raised approximately $48,000,000 as part of Series B fundraising. Bitwise used these funds to meet the demands of a fast-growing employee payroll and fund expansion outside of California. *Id.* at ¶10. By early 2022, Bitwise raised several millions more in investment funds that exclusively went to paying approximately 500 employees and several hundred apprentices across multiple offices. *Id.* at ¶11. Despite receiving considerable funding, Bitwise struggled to cover the ever-growing list of expenses. However, Mr. Soberal saw the positive impact Bitwise had on its employees; the underrepresented people Bitwise sought to employ were growing and receiving opportunities never seen before. He was determined to deliver on his promise to these employees – he would try to keep Bitwise afloat to see others receive these same opportunities.

   While Bitwise created competitive jobs and inspiring office spaces to fuel support of its employees, Bitwise never built an operable financial team. Bitwise initially retained John Dodson as its Chief Financial Officer ("CFO") in 2013. Dodson was initially skeptical of the planned expansion for Bitwise, but he witnessed Mr. Soberal's passion to "revitalize downtown Fresno through the business of technology" and joined the company.[31] By 2015, Mr. Dodson resigned, citing an inability to help the company financially. From 2015 to 2021, Bitwise repeatedly tried to recruit and retain a full-time CFO, but few in the community were equipped for the position.

---

[31] Appendix Tab 18, Letter from John Dodson.

DEFENDANT JAKE SOBERAL'S SENTENCING MEMORANDUM
CASE NO. 24-CR-000159-2

2839819

Bitwise settled on employing a series of short-lived financial consultants to advise on the company's finances from 2015 to 2021. In late 2021, Bitwise found a new CFO, Michael Rodriguez. He stayed only until 2022, when he resigned for personal reasons. Bitwise was left, again, without a financial leader. Mr. Soberal and Ms. Olguin presented several potential candidates to its Board of Directors, but each was swiftly rejected due to their non-traditional backgrounds. Bitwise felt the void of financial leadership as the co-founders tried to balance employee payroll and operating expenses without any track-record or prior experience. By the time a full-time CFO started in early 2023, the company's financial situation was dire.

Bitwise attempted a second round of Series B fundraising in early 2023, however, it did not have enough revenue or cash to justify the requested eight-figure investments. PSR at ¶15. Mr. Soberal buckled under the pressure to raise money to support Bitwise's growing workforce and embarked on a series of terrible decisions. During the fundraising effort that followed, Mr. Soberal and Ms. Olguin altered the company's bank statements to reflect inflated cash balances, and also altered an audit report to show higher revenues in a desperate attempt to raise money. And over the course of the next several months, Mr. Soberal made a series of escalating mistakes, each more desperate and harmful than the last.  What started as a willingness to shade the truth or ignore bad facts quickly turned into overt lies.  And as always, those initial lies lead to more lies, more false statements, and more desperation.  Mr. Soberal deluded himself into thinking that allowing Bitwise to fail was worse than lying to raise money.  He convinced himself that lying was a short-term necessity until a long-term solution could be found.  Mr. Soberal abandoned his values and his sense of right and wrong and deceived the people who trusted and believed in him the most.  Mr. Soberal fully accepts that his conduct was wrong and has caused immeasurable harm and distrust to his teammates, friends, family, and community.

By May 2023, Bitwise had run out of money and Mr. Soberal informed Board of Directors that there was no path forward without a large emergency loan from an existing institutional investor. Mr. Soberal realized he hurt many people who were furloughed when it became clear that Bitwise could not pay its employees. While failing Bitwise's employees and investors

DEFENDANT JAKE SOBERAL'S SENTENCING MEMORANDUM
CASE NO. 24-CR-000159-2

2839819

crushed Mr. Soberal, he knew that starting to tell the truth was the only way to begin making amends for his actions.

### 6.       Accepting Responsibility

Mr. Soberal resolved to face the consequences of his actions early by confessing his wrongdoing and assisting the government in its investigation at the earliest practicable stage. When Mr. Soberal was invited to meet with the government, he told the full embarrassing truth. Mr. Soberal sat for multiple interviews where he answered question after question about the worst moments and decisions of his life. He told the government all the details about Bitwise's financial affairs, knowing that he was helping the government to build a criminal case against him and his best friend, Ms. Olguin. He admitted to the government that he had convinced investors that Bitwise was excelling even though he knew the company was failing. Mr. Soberal admitted to is crimes out of a sincere desire to do some right among the wrongs he previously committed. Mr. Soberal has worked daily to gain back "the value of trust and integrity" which he knows "outweigh everything[.]"[32] Mr. Soberal's sincere intent to take accountability for his actions is reflected in his decision to plead guilty at an early stage to take full accountability for his wrongdoing. *See* Dkt. 42 (Plea Agreement).

In parallel to assisting the government at every stage of this litigation, Mr. Soberal has also engaged in the difficult process of confessing his wrongdoing to those who know him best – his family, friends, and Christian community. Mr. Soberal has been forthright with his community about his mistakes. Once he confessed his mistakes, he did not make excuses or shirk responsibility. Mr. Soberal has "never asserted anything but his guilt[.]"[33]

Pastor Jordan Hogue of the Well Community Church who has known Mr. Soberal for twelve years says he has observed a "deep contrition and repentance at the true level of ownership"[34] in Mr. Soberal since Bitwise's collapse.[35] Mr. Soberal's willingness "to take

---

[32] Appendix Tab 30, Letter from Jordan Hogue.
[33] Appendix Tab 51, Letter from Michael Pierrie.
[34] Appendix Tab 30, Letter from Jordan Hogue.
[35] Appendix Tab 30, Letter from Jordan Hogue.

DEFENDANT JAKE SOBERAL'S SENTENCING MEMORANDUM
CASE NO. 24-CR-000159-2

2839819

responsibility" for his wrongdoing is, in Pastor Hogue's experience, "rare to see[.]"[36]  Pastor Hogue has "never met someone who loved people with such longsuffering grace" for others as Mr. Soberal does.[37] For many, Mr. Soberal is at "the center" of the church community.[38]

Mr. Soberal has also met personally with the victims and hundreds of former Bitwise employees to apologize and express "full responsibility" for his actions.[39]  In the past year, Mr. Soberal has "learned what the warning signs of unhealthy speed and overcommitment look like."[40] Rather than admitting that Bitwise was a failure, as he should have, Mr. Soberal relied on the conditioning from his childhood of avoiding failure at all costs. Mr. Soberal understands how he mistakenly conflated the idea of Bitwise failing with the idea of him being a failure as a son, husband, and father. He has learned that that those are not the same thing, and he has also learned that "even the best of intentions" did not condone his actions.[41]

## III.   THE FACTORS IN 18 U.S.C. § 3553(a) MERIT A BELOW-GUIDELINES SENTENCE

### A.   Applicable Legal Standard Under 18 U.S.C. 3553

This Court has discretion to vary downward by imposing a sentence below the advisory guideline range. *See United States v. Booker*, 543 U.S. 220, 244–45 (2005). While the guidelines are a starting point for fashioning a sentence, courts must make an individualized assessment of each factor set forth in 18 U.S.C. § 3553(a), of which the guidelines are but one factor.  *See United States v. Autery*, 555 F.3d 864, 872 (9th Cir. 2009); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc).  In weighing the section 3553(a) factors, the offense level calculated pursuant to the sentencing guideless must not be given more or less weight than any other factor. *United States v. Paul*, 561 F.3d 970, 974 n.3 (9th Cir. 2009). The factors include (1) the nature of the offense and the history and characteristics of the defendant; (2) the purposes of

---

[36]Appendix Tab 30, Letter from Jordan Hogue.

[37] Appendix Tab 30, Letter from Jordan Hogue.

[38] Appendix Tab 30, Letter from Jordan Hogue.

[39] Appendix Tab 44, Letter from Miguel Macias

[40] Appendix Tab 56, Letter from Sarah Soberal.

[41] Appendix Tab 56, Letter from Sarah Soberal.

2839819

sentencing, including (a) the need to reflect the seriousness of the offense, promote respect for the law, and provide just punishment ("just punishment"); (b) the need to afford adequate deterrence to criminal conduct ("general deterrence"); (c) the need to protect the public from future criminal conduct by the defendant ("specific deterrence"); and (d) the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner ("rehabilitation"); (3) the kinds of sentences available; (4) the guidelines and their policy statements; (5) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"; and (6) the need to provide restitution.

A sentencing court should determine that a guidelines sentence does not apply when "the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless." *Carty*, 520 F.3d at 991 n.6. The guiding principle is that a sentence shall be "sufficient, but ***not greater than necessary***, to comply with the purposes" as described in section 3553(a)(2).  18 U.S.C. § 3553(a) (emphasis added).

Here, based on all of the section 3553(a) factors, imposing a guideline-range sentence would be much greater than necessary to promote the goals of sentencing. Unlike the overwhelming majority of fraud defendants who are motivated by greed and who use fraudulent funds to enrich themselves, Mr. Soberal did not act out of a desire to profit, and he did not retain any of Bitwise's improperly obtained funds. Instead, every penny that he wrongfully and improperly obtained went into Bitwise's bank account and was used to pay for employee and company expenses. Under these facts, courts have consistently recognized that the loss amount that drives the sentencing guidelines is not an accurate reflection of the seriousness of the offense because the guidelines do not differentiate at all between defendants who act out of personal greed and those who act out of a misguided desire to help others.

Moreover, while there is no dispute that Mr. Soberal's actions were wrongful, there should also be no dispute that he is a fundamentally good person who has otherwise led an exemplary life defined by good works. If ever there was a time for Mr. Soberal's lifetime of good

2839819

works to be acknowledged, it is now.  Accordingly, we respectfully submit that the circumstances of this case merit the just imposition of a below-guidelines sentence of 60 months in prison. That is a significant sentence for anyone.  And for someone with three young children who has already seen their life's work destroyed, it is sufficient to accomplish the goals set forth in section 3553(a).

**B.      The § 3553(a) Factors Warrant a Sentence Below the Advisory Guidelines**

**1.      The Nature and Circumstances of the Offense**

Mr. Soberal has admitted to a very serious crime, and he makes no excuse. He deeply regrets each lie he told as part of his desperate and misguided campaign to keep Bitwise afloat. Mr. Soberal fully understands that his actions negatively affected dozens of people. He will spend the rest of his life seeking forgiveness from every one of them—a process that is well underway.

While Mr. Soberal does not minimize his mistakes or the impact to the victims, we respectfully submit that the sentencing guidelines overstates the seriousness of the offense. The PSR calculates the applicable offense level at 34, with a resulting guideline range of 151 to 188 months' imprisonment.  *See* PSR ¶¶55–56, 66. That guidelines range is driven predominantly by a loss amount of over $100,000,000, which increases the guidelines by 24 levels. *Id.* at ¶ 52. But the government agrees Mr. Soberal did not seek to profit and that "[a]ll of the money that Bitwise received through Soberal and Olguin, Jr.'s misconduct went towards paying the company's payroll, outfitting office spaces, repaying debts owed to prior investors."  Dkt. 42 (Plea Agreement) at 15. In other words, while Mr. Soberal made very serious mistakes, his motives were fundamentally different from the vast majority of defendants whose sentences are determined under 2B1.1. Under these circumstances, we respectfully submit that the Court should rely on the factors in 3553(a) rather than the guidelines, which fail to account in any way for the lack of any personal gain to Mr. Soberal.

DEFENDANT JAKE SOBERAL'S SENTENCING MEMORANDUM
CASE NO. 24-CR-000159-2

2839819

### a.   A downward variance is necessary because the loss amount overstates the seriousness of the offense.

In cases where the guidelines range is driven almost entirely by a single factor—the loss amount—the guidelines fail to "provide reasonable guidance," and are of no "help to any judge in fashioning a sentence that is fair, just, and reasonable." *United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2nd Cir. 2008).  More and more, federal courts have recognized that the sentencing guidelines' myopic focus on a loss amount fails to account for the factors in section 3553(a). *See Gupta*, 904 F. Supp. 2d at 351 ("the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account"). This disparity is particularly stark in white-collar fraud cases where the guidelines range is heavily skewed by a loss amount that fails to take into consideration the nature of that loss or the circumstances of the underlying conduct. Indeed, courts have recognized that "[t]he higher the loss amount, the more distorted is the guideline's advice to sentencing judges." *United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013) (Underhill, J., concurring); *see also Gupta*, 904 F. Supp. 2d at 351 ("[b]y making a Guidelines sentence turn, for all practical purposes, on this single factor, the . . . Commission . . . . effectively guaranteed that many such sentences would be irrational on their face." (internal citation omitted)

This problem is particularly acute in this case where Mr. Soberal did not act for personal gain or to enrich himself. As the Government has acknowledged, ***all*** of the proceeds from the criminal activity were used to pay for the salaries and benefits of Bitwise's hundreds of employees as well as other company expenses. The loss amount therefore is directly attributable to the number of employees whose jobs Mr. Soberal was desperately trying to preserve—not his level of greed or malicious intent. The record before this Court is devoid of any evidence of luxury expenditures, premium travel, or self-indulgent spending of any sort—all hallmarks of typical white-collar fraud cases.  While Mr. Soberal is not seeking to justify or excuse his misconduct, we respectfully submit that the loss amount in this case fails to distinguish between those who lie to enrich themselves and those who lie out of a desperate attempt to keep their

DEFENDANT JAKE SOBERAL'S SENTENCING MEMORANDUM
CASE NO. 24-CR-000159-2

2839819

1   businesses afloat and preserve the jobs of those who depend on them.  It thus does not provide a

2   fair approximation of his criminal culpability.

3          In cases like this where the defendant was not acting out of greed or a desire to profit,

4   courts have recognized that a rigid Guidelines calculation *overstates* the seriousness of the

5   offense.

6          For example, in *United States v. Keller*, the Court applied a four-level variance even

7   though "the defendant falsified documents" because "he received no monetary benefit." 2005 WL

8   6192897, at *7 (N.D. Tex. Oct. 17, 2005). Further, the district court considered that the defendant

9   "expressed seemingly sincere remorse," such that the defendant seemed "to be a generally law-

10  abiding man who made an unfortunate choice due to family stress, physical health problems, and

11  pressure from his employers." Like in *Keller*, Mr. Soberal did not financially benefit from the

12  offense and has provided a letter expressing remorse that the Court should take into account.

13  PSR at p. 26-28.  Similarly, In *United States v. Lay*, 568 F. Supp. 2d 791 (N.D. Ohio 2008), the

14  court applied a six-level variance which was primarily "triggered by the fact that the loss to the

15  [victim] did not accrue to the benefit of the defendant." *Id.* at 807–808. And in *United States v.*

16  *Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008), the district court varied downward to 60 months

17  from a guideline of 360 to life because the defendants' misconduct and level of greed was

18  "simply not in the same league" as the white-collar defendants who have received double-digit

19  prison terms. *Id.* at 754.  The same is true in *United States v. Connors*, where the court recognized

20  as a mitigating factor the fact that the defendant was "motivated by a desire to save the company

21  and to save the jobs of its employees," in contrast to "greed and pure personal gain," which "are

22  usually the driving force for many, if not most, fraud offenders[.]"  2007 WL 2955612, at *3

23  (E.D. Pa. Oct. 9, 2007); *see also United States v. Prosperi*, 686 F.3d 32, 50 (1st Cir. 2012)

24  (affirming district court's sentence, including based on finding that the defendants had not

25  "sought to enrich themselves").

26         There is no dispute that the driving force behind the fraud in this case was Mr. Soberal's

27  misguided belief that he could not allow Bitwise to fail. That is why Mr. Soberal loaned virtually

28

DEFENDANT JAKE SOBERAL'S SENTENCING MEMORANDUM
CASE NO. 24-CR-000159-2

2839819

all of *his own* family's personal savings to the company at the time he was committing the

underlying offenses. These facts are fundamentally different from the overwhelming majority of

fraud cases with high loss amounts where the defendants acted out of greed and were the sole or

primary beneficiaries of the fraud. But this critical distinction is nowhere accounted for or

reflected in the guideline's calculation of this offense. That is because sentencing guidelines are

meant to offer the Court a starting point for "heartland" cases, meaning the "set of typical cases

embodying the conduct that each guideline describes." *Koon v. United States*, 518 U.S. 81, 93

(1996). When the Court is faced with an atypical case—such as here—it can and should consider

an appropriate variance from the guidelines. *Id.*  Indeed, the facts of this case present an

encouraged basis for a downward adjustment from the guidelines. *Carty*, 520 F.3d at 991 n.6; *see*

*also United States v. Milne*, 384 F. Supp. 2d 1309, 1310–11 (E.D. Wis. 2005) (downward

variance justified where the "defendant did not take the bank's money out of greed or a desire to

live a lavish lifestyle; rather, he misguidedly tried to keep a sinking business afloat").

Mr. Soberal respectfully asks this Court to consider the facts and circumstances of this

case rather than the mechanical loss amount driving his guidelines range.

> **b.  The guidelines range does not adequately account for all of the good Bitwise was seeking to accomplish.**

Mr. Soberal knows now how wrong his actions were and that his underlying goals—no

matter how laudable—cannot justify those actions. But a complete picture of the "nature and

circumstances of the offense" nevertheless requires acknowledgment of those goals. Ultimately,

Mr. Soberal's goal was to save a company that he believes was a source of good for many people.

While the sudden and shocking demise of Bitwise has certainly colored peoples' perceptions of it,

we submit dozens letters from former Bitwise employees that attempt to capture why Mr. Soberal

believed Bitwise was worth saving.  These employees describe how Bitwise was "dedicated to

creating pathways into the tech industry for those from underrepresented backgrounds." Mr.

Soberal was "passionately committed to this mission, not just in words but in action."[42] These

---

[42] Appendix at Tab 6, Letter from Christian Beltran-Johnson

2839819

employees came from "traditionally overlooked communities and had to work through numerous stereotypes" to achieve gainful employment.[43] For many, Bitwise presented an opportunity to "achieve milestones" many never thought possible" such as purchasing a home or learning to code.[44] While it was wholly improper to falsely represent Bitwise's financial condition to investors, for the many people Mr. Soberal employed at Bitwise, he "wasn't just offering me a job – he was offering me a future."[45]

Bitwise accomplished allowing underrepresented individuals to compete in an increasingly competitive tech industry. It created 900 jobs filled by many who otherwise would have never earned leverageable technology skills, and most of whom now have other competitive careers in the tech industry. Those employees were overwhelmingly diverse: over 60% women, 50% Latino, 10% from the LGBT community and/or first-generation.  Bitwise's training programs benefited people in the community with "an opportunity to upskill themselves and find an opportunity that would allow for them to make a livable wage."[46] One such initiative "involved launching a coding academy in Fresno that provided free training to thousands of individuals, many of whom secured well-paying jobs in the tech industry upon graduation"[47] One former employee notes that he is "grateful for the skills and knowledge" he gained, "which some might only acquire through expensive university programs." [48] Mr. Soberal asks this Court to consider all of the good that Bitwise was intended to—and did—accomplish for so many deserving people.

## 2.     Mr. Soberal's History and Characteristics

"[I]f ever a [person] is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his

---

[43] Appendix at Tab 4, Letter from CJ Banks.
[44] Appendix at Tab 21, Letter from Carley Feil.
[45] Appendix at Tab 11, Letter from Vanessa Ceballos.
[46] Appendix at Tab 46, Letter from Stephanie Moreno.
[47] Appendix at Tab 4, Letter from CJ Banks.
[48] Appendix at Tab 42, Letter from Sal Lucatero Jr..

DEFENDANT JAKE SOBERAL'S SENTENCING MEMORANDUM
CASE NO. 24-CR-000159-2

2839819

sentencing, when his very future hangs in the balance." *Adelson*, 441 F. Supp. 2d at 513–14 (cleaned up). The best demonstration of Mr. Soberal's personal characteristics are set forth in the letters submitted by those who know him best.  The letters describe how Mr. Soberal lives his life with generosity and service to others. These letters underscore that he did not start Bitwise to make himself wealthy, he started Bitwise to bring wealth to others.

　　　　As much as these letters describe a hardworking, honest, and reliable person, they also highlight how deeply the offense conduct deviated from who Mr. Soberal is. These letters describe his personal values that he has returned to since the offense, and who he will be after serving his sentences. These letters come from teammates, community leaders, mentors, fellow church members, classmates, family members, and close friends. Notably, these also include letters from victims of the offense who bore the loss of Bitwise's collapse.  Mr. Soberal's supporters come from diverse backgrounds, varying socio-economic conditions, and have received different levels of education. These letters convey a common request for leniency for Mr. Soberal because this conduct is not an accurate summation of who Mr. Soberal is, rather it was a mistake that Mr. Soberal will never make again.

### a.　　Improving the community through charitable works

　　　　Mr. Soberal remains dedicated to continuing the charitable works that were foundational to his life before, during, and after Bitwise. Courts consistently recognize that charitable works illustrate a defendant's positive history and characteristics to support a downward variance under section 3553(a). *See also United States v. Tomko*, 562 F.3d 558, 572 (3d Cir. 2009) (en banc) (court affirmed the grant of a downward variance under section 3553(a) based in part on letters written on the defendant's behalf that involved his "pre-indictment charitable acts that involved not only money, but also his personal time."); *United States v. Thurston*, 544 F.3d 22, 26 (1st Cir. 2008) (the court appropriately considered the defendant's "charitable work, community service, generosity with time, and spiritual support and assistance to others" as part of the defendant's history and characteristics). Although significant, the letters to the Court do not fully demonstrate the sum of Mr. Soberal's charitable contributions to his community.

2839819

### i.   Mr. Soberal empowered economic mobility

Community leaders recognize that Mr. Soberal has an exceptional commitment to improving economic mobility for Fresno's residents. Mr. Soberal's "arrival in the Central Valley was marked" by his "commitment to the community and dedication to creating position economic opportunities[.]"[49]  In support of this goal, Mr. Soberal volunteered as a mentor in the Entrepreneur Mentorship Program at California State University and the Spark Tank, a local entrepreneur competition. He gave of his time when he "regularly met with participants, offering one-on-one mentorship"[50] and gave them "catalytic feedback and encouragement."[51] He did so with fully altruistic spirit, "without any expectation of compensation[.]"[52] He was guided solely by his "genuine commitment to supporting the next generation of entrepreneurs."[53]

Philip Neufeld, who is the Executive Officer of Information Technology at Fresno' Unified School District, knows about Fresno's technology limitations better than most. He has resided in Fresno since the 1990s and worked closely with Mr. Soberal while he operated Bitwise. Mr. Neufeld, like Mr. Soberal, identified that Fresno is an "underdog city with digital disinvestment impacting low-income residence and a malnourished tech ecosystem." Mr. Soberal's charitable spirit led to the launch of Bitwise which led to "substantial upskilling of talent, increase in tech jobs that fit the region's talent, and meaningful work by the firms that address regional problems – like water scarcity. Mr. Soberal, has "enormous potential" to continue "contributing to health communities, resilient economies, and people's lives[.]" Those familiar with Mr. Soberal's dedication to charitable works in the community ask this Court to look at "the totality and longevity of [his] good deeds toward our community" when imposing a sentence.[54]

---

[49] Appendix Tab 59, Letter from Dr. Timothy Stearns.

[50] Appendix Tab 59, Letter from Dr. Timothy Stearns.

[51] Appendix Tab 34, Letter from Carlos Huerta.

[52] Appendix Tab 59, Letter from Dr. Timothy Stearns.

[53] Appendix Tab 59, Letter from Dr. Timothy Stearns.

[54] Appendix Tab 43, Letter from Vikki Luna.

DEFENDANT JAKE SOBERAL'S SENTENCING MEMORANDUM
CASE NO. 24-CR-000159-2

2839819

### ii. Mr. Soberal commits his physical labor to helping others

Mr. Soberal has a long-demonstrated record of serving the community's most vulnerable people with physical acts of service. This dedication towards service of others is recounted by several non-profit community leaders. The Founder and C.E.O. of Light House Recovery Program in Fresno, Vikki Luna, has witnessed this dedication over the last decade. Ms. Luna runs a "non-profit home for disadvantaged women" recovering from "substance abuse" and their children.[55] The program operates a "coffee shop that we utilize to train the ladies" that was in "desperate need of" improvements. Mr. Soberal committed not just his time and money, but his physical labor. He "gathered his men's group," and showed up two nights in a row "with supplies in hand[.]"[56] Mr. Soberal worked with the group "well into both nights after their regular day's work." Mr. Soberal is someone known to organizational leaders "to be generous and kind. Concerned with the needs of his community. Without having to be asked."[57]

Rather than forgoing his dedication to the community because of Bitwise's failure, Mr. Soberal has leaned deeper into aiding the community. Dr. Randy White, A retired non-profit leader who has known Mr. Soberal for fifteen years has personally witnessed Mr. Soberal's labor of love for others. This summer, when a local non-profit was renovating a building, Mr. Soberal was there; "he had shown-up earl[y]" and put in "hours doing very heavy manual labor, and "stayed later" than others "until the job was done."[58] Although Mr. Soberal's "training and professional career have been distinctly white collar," he devotes his physical labor where it is needed in the aid of others. His "authentic love for the community of Fresno" was apparent before his arrest and remains. [59] Mr. Soberal asks that this Court consider his dedication towards others as one measure of his character when imposing a sentence.

---

[55] Appendix Tab 43, Letter from Vikki Luna.
[56] Appendix Tab 43, Letter from Vikki Luna.
[57] Appendix Tab 43, Letter from Vikki Luna.
[58] Appendix Tab 67, Letter from Reverend and Dr. Randy White.
[59] Appendix Tab 67, Letter from Reverend and Dr. Randy White.

DEFENDANT JAKE SOBERAL'S SENTENCING MEMORANDUM
CASE NO. 24-CR-000159-2

2839819

### b.    Support from Mr. Soberal's Christian community

Mr. Soberal became determined to follow the church's teachings when he relocated back to Fresno in 2010. Church and love people are core tenets in Mr. Soberal's life.[60]  Mr. Soberal is an "active member in his church"[61] who is a "deeply committed man of Christian faith" who "regularly donates his time and money to things he knew would help people."[62]  He is the "center" of the church community[63] who has a "character and commitment to serving others firsthand."[64]

Mr. Soberal recognizes with great pain that the underlying offense conduct is inconsistent with his faith and the church's teachings. Mr. Soberal's friend, Carter Chavez is a teacher at Central Valley State Prison who uniquely understands offenders and interacts with incarcerated people daily. Mr. Chavez does not believe that Mr. Soberal's choices to commit fraud were "driven by money, greed, or a pursuit to becoming wealthy."[65]  "As a Christian, [Mr. Soberal] looked at his role at Bitwise as a way to serve the underprivileged and disenfranchised."[66]

Mr. Soberal is accountable to and open with his community about his transgressions. He has shared with "many" in his church community that he "made [a] serious mistake at Bitwise and fully accepts responsibility."[67] He demonstrated "deep understanding" for the "consequences" of his behavior.[68] His church community has "surrounded him to support him" and "will continue to do so after incarceration."[69]

Those closest to Mr. Soberal know that, despite how wrongful his actions were, they were

---

[60] Appendix Tab 56, Letter from Sarah Soberal.

[61] Appendix Tab 16, Letter from Carl Deese.

[62] Appendix Tab 55, Letter from Phil Skei.

[63] Appendix Tab 30, Letter from Jordan Hogue.

[64] Appendix Tab 19, Letter from Andrew Feil.

[65] Appendix Tab 12, Letter from Carter Chavez.

[66] Appendix Tab 12, Letter from Carter Chavez.

[67] Appendix Tab 19, Letter from Andrew Feil.

[68] Appendix Tab 19, Letter from Andrew Feil.

[69] Appendix Tab 14, Letter from Chris Collins.

26

2839819

not motivated by greed.  Instead, he was motivated "to keep hundreds of individuals employed, to continue to support and catalyze the revitalization of the central valley and downtown of Fresno that was, for so long, downtrodden and ignored."[70]

### c.    Support from victims

Mr. Soberal's good character is even reflected in letters submitted from some of the victims of his misconduct.  Business owner Rick Berry, who has known Mr. Soberal for fifteen years, loaned money to Bitwise on two to three occasions.[71]  Before 2023, Bitwise timely repaid each loan with interest. Mr. Berry loaned a final $100,000 to Bitwise approximately two months before the company collapsed, which was never repaid. Despite Mr. Soberal's wrongful conduct, Mr. Berry believes that "Mr. Soberal is a man of "honesty" and "humility" who did not "maliciously or intentionally set out to take advantage or scam [him] in any way."

██████████████████████████████ who witnessed Mr. Soberal grow Bitwise from the ground up, saw his "dedication to making a difference in Fresno."[72] ███████████ loaned Bitwise ███████████ that was not repaid.  They know people who were impacted by Bitwise's closure. Still, they witnessed the positive impact that Bitwise had on community members because they "knew a lot of people who were employed there" who were "satisfied with their work experience."

██████████████, a business partner to Bitwise, saw Mr. Soberal bring dedication to the improving disenfranchised communities, even outside of Fresno, through Bitwise's work in ████████. ████████ was a leader of the ██████████, the non-profit that loaned Bitwise ████████ worked closely with Bitwise on expansion of its work to ███████████ parting statements about Bitwise and Mr. Soberal's conduct are this: "I maintain that [Mr. Soberal] was sincere in his desire to serve our communities, to create good jobs, to provide economic opportunities in tech to working class neighbors. I have no doubts about that even today."[73]

---

[70] Appendix Tab 34, Letter from Carlos Huerta.

[71] Appendix Tab 8, Letter from Rick Berry.

[72] Appendix Tab 27, Letter from ██████████████.

[73] Appendix Tab 9, Letter from ████████████.

DEFENDANT JAKE SOBERAL'S SENTENCING MEMORANDUM
CASE NO. 24-CR-000159-2

2839819

Mr. Soberal has made an effort to sit down and speak with every victim in this case. While he understands that some of the victims will never forgive him, there are many more who have and who are not willing to forget his lifetime of good actions.

### d.    Loving husband and father

Mr. Soberal is one of the "most dedicated" and "loving" fathers and husbands." [74] Mr. Soberal is the fortunate parent to three "wonderful, kind, and smart children," [75] ages 11, 10, and 7. As a father, he provides "attention, affirmation, and love, to his three young children." [76] Mr. Soberal's relationship with Sarah Soberal and their children is "an explararary model." [77]

Mr. Soberal has passed on to his children the importance of community. Mr. Soberal's neighbor and friend, Jeremy Isch, described an instance in 2016 when Mr. Soberal rallied neighbors to send their children to a low-income public school in Fresno. To "support the school," Mr. Soberal sent his children to attend. [78] Mr. Soberal "never did these acts of service for credit or recognition, but because of a genuine desire to see the school thrive." [79]

A lengthy sentence of incarceration will cause Mr. Soberal to miss pivotal moments in his children's lives. Even while serving a sentence of incarceration, Mr. Soberal "will continue to dedicate his life to his kids and [wife]." [80]  However, the "absence of [Mr. Soberal]" as a father will "create another generation of wounded children." [81]  A lengthy sentence creates more victims because his wife, Sarah, and three children "will suffer" from the distance created by incarceration." [82]

---

[74] Appendix Tab 58, Letter from Sean Stacier.

[75] Appendix Tab 61, Letter from Morgan Soberal-Terry.

[76] Appendix Tab 48, Letter from Phil Neufeld.

[77] Appendix Tab 11, Letter from Vanessa Ceballos

[78] Appendix Tab 35, Letter from Jeremy Isch.

[79] Appendix Tab 35, Letter from Jeremy Isch.

[80] Appendix Tab 57, Letter from Jason Stacier.

[81] Appendix Tab 61, Letter from Morgan Soberal-Terry.

[82] Appendix Tab 51, Letter from Michael Pierrie.

DEFENDANT JAKE SOBERAL'S SENTENCING MEMORANDUM
CASE NO. 24-CR-000159-2

2839819

### 3.   The Purposes of Sentencing

#### a.   Mr. Soberal will not repeat his mistakes

Mr. Soberal understands that any sentence must reflect the seriousness of his offense. His mistakes were grievous, and he will not make them again. Specific deterrence bears on a defendant's propensity to commit further crimes of the same nature. *See United States v. Johnson*, No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018). Mr. Soberal's isolated series of mistakes stand in stark contrast to the strong character demonstrated throughout the course of his 38 years and described in the dozens of letters of support provided to the Court. Mr. Soberal spent the last decade building Bitwise, which due to his own actions collapsed. There is zero risk that Mr. Soberal will repeat his errors.

For white collar defendants, the stigma, shame and embarrassment of their offenses are specific deterrents of future crimes. *See Faulkenberry*, 759 F. Supp. 2d at 927. For particularly publicized offenses, reputational harm is a likely indicator that a defendant will not commit a similar offense. *Cf. Gupta*, 904 F. Supp. 2d at 355 ("As to specific deterrence, it seems obvious that, having suffered such a blow to his reputation, [the defendant] is unlikely to repeat his transgressions, and no further punishment is needed to achieve this result.").

Mr. Soberal has a "willingness to take responsibility and learn from his mistakes." [83] Mr. Soberal has incurred brutal public scrutiny from the very people he sought to serve – the Central Valley community. He was disgraced amongst Fresno's business leaders due to the publicized nature of this case that included a press conference on the steps of the federal district courthouse. In addition to the publicity Bitwise received, Mr. Soberal took additional steps to apologize to the community for his offenses by drafting an "apology letter that was sent out publicly in the newspaper and digitally in several locations."[84] Mr. Soberal is dedicated to continued accountability and accepting responsibility for his mistakes. The public embarrassment—along with the financial ruin—that Mr. Soberal and his family have experienced is a punishment of its

---

[83] Appendix Tab 70, Letter from Linda Yacoub.
[84] Appendix Tab 70, Letter from Linda Yacoub.

DEFENDANT JAKE SOBERAL'S SENTENCING MEMORANDUM
CASE NO. 24-CR-000159-2

2839819

1  own.

2      **b.    A sentence of 60 months will serve as a general deterrent**

3      Any sentence of incarceration is a deterrent to similarly situated defendants. "General

4  deterrence is designed to dissuade others form engaging in similar fraudulent conduct."

5  *Faulkenberry*, 759 F. Supp. 2d at 927. "[T]here is considerable evidence that even relatively short

6  sentences can have a strong deterrent effect on prospective 'white collar' offenders." *See Adelson*,

7  441 F. Supp. 2d at 514. Studies on offender behavior show that while sentences of imprisonment

8  may promote general deterrence, there is no marginal deterrent effect from more severe prison

9  sentences. *See, e.g., Michael Tony, Purposes and Functions of Sentencing,* 34 Crime & Just. 1,

10  28–29 (2006) (three National Academy of Sciences panels found no significant marginal

11  deterrent effect from lengthier sentences). White collar crimes are "prime candidate[s] for general

12  deterrence" because these offenders weigh the consequences of their actions, including the

13  potential for incarceration. *See Stephanos Bibas, White–Collar Plea Bargaining and Sentencing*

14  *After Booker*, 47 Wm. & Mary L.Rev. 721, 724 (2005). The reality is that former business

15  executives fear even modest prison terms such that any length of incarceration serves as a

16  deterrent. *Gupta*, 904 F. Supp. 2d at 355.

17      Imposing a guideline range sentence on Mr. Soberal does not serve the goals of

18  sentencing. Mr. Soberal lost his life savings through the collapse of Bitwise, and his family's

19  financial situation is precarious.  Mr. Soberal faces the reality of significant time away from his

20  family and ultimately reintegration into the same community where he committed his offense.

21  Adding a lengthy prison sentence does little to increase the deterrent effect when Mr. Soberal still

22  faces various other consequences such as losing his license to practice law, his status as a

23  convicted felon, and payment of restitution. An unduly long sentence does not accomplish the

24  statutory goals of sentencing when considering the other hurdles offenders like Mr. Soberal face

25  post-incarceration. Further, setting an example of Mr. Soberal by imposing an unduly punitive

26  sentence serves no purpose other than to disproportionately punish him for conduct that he will

27  spend the rest of his life making up to his family and community. A sentence of 60 months

28

DEFENDANT JAKE SOBERAL'S SENTENCING MEMORANDUM
CASE NO. 24-CR-000159-2

2839819

incarceration is a lengthy sentence that conveys the seriousness of Mr. Soberal's offense.

### 4.    A Need to Avoid Unwarranted Sentencing Disparities

Section 3553(a)(6) requires that a sentencing court consider the sentences imposed on similarly situated offenders to avoid unwarranted sentencing disparities. A nationwide review of other white-collar cases demonstrates two things: first, Mr. Soberal's prompt acceptance of accountability is a rarity amongst fraud defendants facing similarly lengthy sentences; and second, defendants facing similar or higher loss amounts have received sentences far below Mr. Soberal's calculated guidelines. We respectfully submit that the guideline range applicable to Mr. Soberal is far more severe than in comparable fraud causes. A variance from the guidelines is necessary to avoid a sentencing disparity.

Imposing a below-guidelines sense is necessary to avoid a sentencing disparity when considering the Judiciary Sentencing Information (JSIN) data on sentences in the Ninth Circuit and the Eastern District of California. In 2023, the sentencing commission collected data from 392 cases on the frequency with which offenders receive a below guidelines sentence. The data shows that in this very district, courts applying § 2B1.1, imposed a below guidelines sentence in 72% of cases.[85] A sentence below the guidelines is necessary to avoid unequal sentencing. *See Faulkenberry*, 759 F. Supp. 2d at; *Adelson*, 441 F. Supp. 2d 10 at 513.

JSIN data from all districts confirms that white-collar defendants with the exact same guidelines and criminal history as Mr. Soberal are regularly sentenced below guidelines. JSIN collected data from forty-seven defendants from the last five fiscal years whose primary guideline was § 2B1.1, with a final offense level of 34 and a criminal history category of I.[86] For all 47 defendants, the average sentence imposed was 116 months, which is far below the low end of Mr.

---

[85] See JSIN, Sentences Under the Guidelines Manual and Variances Over Time, https://ida.ussc.gov/analytics/saw.dll?Dashboard (last visited December 2, 2024). This database does not include data on a specific loss amount, but it does permit analysis of defendants who committed offenses in Zone D of the sentencing table, meaning the total offense level required a sentence of incarceration.

[86] This data excludes defendants who received a §5K1.1 substantial assistance departure. See U.S. Sentencing Commission, Interactive Data Analyzer, https://ida.ussc.gov/analytics/saw.dll?Dashboard (last visited December 2, 2024).

2839819

Soberal's guidelines range.  *See* PSR ¶108.  Notably, this sentencing data does not account for defendants like Mr. Soberal who did not seek to profit from their offenses. A guideline sentence in this case would be particularly unjust when compared to the below-guidelines sentences imposed on more typical white-collar defendants.

A review of sentences imposed on highly publicized defendants in white collar prosecutions similarly reinforces the conclusion that a guidelines sentence would result in unwarranted sentence disparities. Given the numerous and duplicative enhancements that apply to cases driven by § 2B1.1, courts frequently sentence defendants with high loss figures and no criminal history to substantially below-Guidelines sentences. For example, each of the below defendants received a downward variance even though they all (unlike Mr. Soberal) substantially profited from their crimes.  For example:

- In February 2021, the COO of a publicly traded biopharmaceutical company was sentenced after a trial guilty verdict on one count of wire fraud to 12 months in custody in light of the ongoing economic hardship he would face in the future, his general good works, and the need for some prison time to address general deterrence; the "[b]izarre, barbaric," and "absurd" Guidelines range was the statutory maximum of 20 years (on an initial range of 262 to 327 months). *United States v. Taylor*, 1:19-cr-00850-JSR (S.D.N.Y.), Sentencing Tr., Dkt. 157, at 2.

- In November 2019, a hedge fund trader who was found guilty after trial of overinflating the hedge fund's assets by $100 million was sentenced to 40 months' imprisonment; the government and the Probation Office had calculated a Guidelines range of 168 to 210 months. *See United States v. Shor*, 1:18-cr-00328 (S.D.N.Y.), Dkt. Nos. 297, 301.

- In November 2018, an individual who was convicted of securities fraud after trial in the District of Massachusetts, was sentenced to a term of six months' imprisonment where the government had calculated a Guidelines prison sentence of 63 to 78 months. *See United States v. Wang*, 1:16- cr-10268 (D. Mass.), Dkt. Nos. 346, 429.

32

DEFENDANT JAKE SOBERAL'S SENTENCING MEMORANDUM
CASE NO. 24-CR-000159-2

- In October 2018, a former State Street executive who was convicted after trial of securities fraud, was sentenced to a term of 18 months' imprisonment; the government had calculated a Guidelines sentence of 14 to 17 years. *See United States v. McClellan*, 1:16-cr-10094 (D. Mass.), Dkt. Nos. 517, 520.

- Five defendants in the *AIG/Gen Re:* case, were convicted at trial of securities fraud, mail fraud, and conspiracy in connection with $597 million in losses. Each defendant contested the offense conduct and loss at trial. The defendants received sentences of 48 months, 24 months, 12 months and a day, 12 months and a day, and 18 months, respectively. Defendant Christian Milton received the sentence of 48 months. He had the highest attributed loss amount, a total of $544,000,000, with a guideline range requiring life imprisonment.  *See United States v. Ferguson*, No. 3:06-cr-00137 (D. Conn. 2008); Dkts. 1199; 1216; 1243;1260; 1269. The court's individualized assessment of section 3553(a) factors resulted in sentences dramatically below the guidelines.

- In *Adelson*, Impath's ex-COO, Richard Adelson, was convicted after a two-week securities fraud trial. *Adelson*, 441 F. Supp. 2d at 507. Adelson lied to Impath's shareholders about its huge losses, ultimately causing a stock drop of 88% and "a combined loss" to Impath's "thousands of shareholders" of no less than $260 million. *Id.* at 509. Adelson's total offense level—which included enhancements for "more than 250 victims" and obstruction of justice—was 46 points, which called for a sentence of life imprisonment. *Id.* at 510. In the end, Adelson served less than three years in prison.

- Similarly, in *United States v. John Whittier*, a hedge fund manager was sentenced to 36 months in prison following his guilty plea to charges of securities fraud in a scheme resulting in losses of $88 million.  Though the Guidelines recommended a sentence of 188 to 235 months' in prison (total offense level of 36 and a criminal history category of I), the court imposed a sentence of 36 months.  *See* No. 07-CR-0087 (S.D.N.Y.

2007).

- In *United States v. Olis*, James Olis of Dynergy was convicted at trial of securities fraud in connection with an accounting scheme that attempted to mask $300 million of debt as revenue.  2006 WL 2716048 (S.D. Tex. Sept. 22, 2006), The court determined that there was an intended loss of $79 million, giving Olis an offense level of 34 and a recommended guidelines range of 151 to 188 months.  *Id.* at *10.  The court sentenced Olis to a below-Guideline sentence of 6 years in prison.  *Id.* at *12.  Olis' co-conspirators "received lower, non-guideline sentences [of 15 months and 1 month, respectively] because they pleaded guilty and cooperated with the government."  *Id.* at *14.  The court noted that "lower sentences based on cooperation with the government were intended by Congress and the Sentencing Commission."  *Id.*

Mr. Soberal is ashamed of his conduct and has not made any excuses.  But it is not an excuse to rightly point out that his conduct is not in the same league as defendants who defrauded investors for their own personal gain. In *United States v. Parris*, for example, the district court recognized the need to differentiate at sentencing between run-of-the-mill fraud cases and "fraud prosecutions of those who have been responsible for wreaking unimaginable losses on major corporations…such as Enron."  573 F. Supp. 2d 744, 746 (E.D.N.Y. 2008). In *Parris*, the co-defendants' Guidelines range was 360 months, and each defendant personally profited $2,560,000. *Id*. at 748. But the court recognized that the conduct at issue was "not in the same league" as in cases like Enron or other corporate failures. *Id.* The court entered a below-sentence guideline of 60 months. *Id.* Like in *Parris*, Mr. Soberal's conduct is not in the leagues of the Enron defendants who stole billions to personally enrich themselves.

Mr. Soberal pleaded guilty. He cooperated with the government from the outset. Unlike the ranks of white-collar defendants who fought tooth and nail, expending valuable government resources to defend wrongful conduct, Mr. Soberal readily accepted accountability for his actions. Looking across the landscape of sentencings in fraud cases, it is clear that a guidelines sentence for Mr. Soberal would be an extreme and undeserved outlier.

DEFENDANT JAKE SOBERAL'S SENTENCING MEMORANDUM
CASE NO. 24-CR-000159-2

2839819

### 5.    Restitution

The PSR recommends that Mr. Soberal pay $114,600,000 in restitution. PSR ¶119. Mr. Soberal does not contest a restitution order. He will likely spend the rest of his life repaying investors for his conduct. Mr. Soberal's financial obligations will be particularly challenging to navigate when he reintegrates with society. This restitution order coupled with a brief term of incarceration is a reasonable and just punishment. *See Adelson*, 441 F. Supp. 2d 506, 514 ("In the case of financial fraud, however, an important kind of retribution may be achieved through the imposition of financial burdens."). This factor, therefore, does not support the imposition of a within-Guidelines sentence of imprisonment.

### C.    RDAP and Self-Surrender

Mr. Soberal respectfully requests that, pursuant to Probation Department's recommendation, the Court specify that he participate in the 500-hour Bureau of Prisons Substance Abuse Treatment Program.  PSR at ¶95.  While not an excuse for his mistakes, Mr. Soberal began abusing alcohol as a coping mechanism for the stress and pressure caused by Bitwise's mounting financial problems and his desperate measures to solve them.  Because of the limited number of facilities that offer the Substance Abuse Program, we respectfully request that the Court recommend that the Bureau of Prisons assign Mr. Soberal to the Federal Correctional Facility at Lompoc.

Mr. Soberal also respectfully requests that he be permitted to self-surrender to the Bureau of Prisons to serve whatever sentence this Court imposes.  He has been fully compliant with Pretrial Services and the Government.  Mr. Soberal is not a flight risk – he is a father of three young children who has deep ties to his community.

## IV.    CONCLUSION

For the foregoing reasons, Mr. Soberal respectfully requests that the Court impose a sentence of no more than 60 months of imprisonment.  Such a sentence would be sufficient, but not greater than necessary, given Mr. Soberal's significant contributions to the community and his lack of financial motivation or desire to self-enrich. A custodial sentence of 60 months would

---

DEFENDANT JAKE SOBERAL'S SENTENCING MEMORANDUM
CASE NO. 24-CR-000159-2

2839819

1  appropriately reflect the seriousness of the offense, take into account Mr. Soberal's service to

2  Fresno, his complete lack of criminal history and provide just punishment and deterrence.

DEFENDANT JAKE SOBERAL'S SENTENCING MEMORANDUM
CASE NO. 24-CR-000159-2

2839819

1    Dated:  December 9, 2024                        KEKER, VAN NEST & PETERS LLP

2

3                                          By:    /s/ Eric H. MacMichael
                                                 ERIC H. MACMICHAEL

4                                                Attorneys for Defendant Jake Soberal

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28